397 A.2d 1147

**GOLDEN TRIANGLE BROADCASTING, INC., Westinghouse Broadcasting Company, Inc., WIIC–TV Corporation and WKJF FM, Inc., Appellants,**

v.

**CITY OF PITTSBURGH, a Municipal Corporation, Joseph M. Barr, Mayor, City of Pittsburgh, David A. Smith, Treasurer, City of Pittsburgh, Donald J. Bucholtz, Superintendent, Business Privilege Tax, City of Pittsburgh.**

Supreme Court of Pennsylvania.

Argued Oct. 16, 1978.

Decided Jan. 24, 1979.

Reargument Denied March 1, 1979.

526

Frank L. Seamans, Dale E. Williams, Samantha Francis Flynn, Dennis J. Lewis, Eckert, Seamans, Cherin & Mellott, Pittsburgh, for appellants.

Mead J. Mulvihill, Jr., City Sol., Grace S. Harris, Exec. Asst. City Sol., Pittsburgh, for appellees.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

The Local Tax Enabling Act authorizes the City of Pittsburgh to "levy, assess and collect" taxes upon "persons, transactions, occupations, privileges, subjects and personal property,"[1] but denies the City the authority to tax "manufacturing."[2] Pursuant to the Act, the City imposes a "Business Privilege Tax." Appellants, radio and television broadcasters, brought an action in equity, alleging they are "manufacturers" not subject to the City's tax.[3] Appellants sought to enjoin the City from collecting its Business Privilege Tax upon their revenues. The chancellor concluded that appellants are "manufacturers" and enjoined collection of the tax. On the City's appeal, the Commonwealth Court reversed. We granted allowance of appeal and now affirm.[4]

## I

Throughout these proceedings, appellants have maintained that they "derive their revenues from those who seek to convey commercial messages to the public in the same

1. Act of December 31, 1965, P.L. 1257, § 2, 53 P.S. § 6902 (1972).

2. Section 2 of the Act provides in part:
   "[L]ocal authorities shall not have authority by virtue of this act:
   \*  \*  \*  \*  \*  \*
   (4) To levy, assess and collect a tax on goods and articles manufactured in such political subdivisions or on the by-products of manufacture, . . . or on any privilege, act or transaction related to the business of manufacturing, . . . by manufacturers . . . with respect to the goods, articles and products of their own manufacture . . . ."

3. Appellants include Golden Triangle Broadcasting, Inc., Westinghouse Broadcasting Co., WIIC–TV Corp., and WKJF FM, Inc.

4. We hear this appeal pursuant to the Appellant Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 204(a), 17 P.S. § 211.204(a) (Supp.1978). According to the City, this Court is not

fashion that the newspapers derived their advertising receipts from those who buy space in their newspapers."[5] Our task is to determine whether the activity which produces appellants' revenues is "manufacturing" for purposes of the Local Tax Enabling Act. The Legislature provides no definition of "manufacturing" for purposes of the Act, and this Court has not yet considered the term as used in the Act. But "[t]his definitional vacuum has been filled by a judicial definition of the term which has emerged from a long line of cases extending back over a hundred years' time." *Commonwealth v. Deitch Co.*, 449 Pa. 88, 92, 295 A.2d 834, 837 (1972) (discussing "Capital Stock Tax" Act[6]). *Deitch* summarizes the "judicial definition" that has "emerged" from our "long line of cases:"

" 'The meaning of "manufacturing" has been restated by this Court in *Philadelphia School District v. Parent Metal*

presented with a "final order" for purposes of Section 204(a) of the Act. The Commonwealth Court reversed the chancellor on statutory grounds and remanded for consideration of appellants' alleged grounds for relief the chancellor did not reach. The Commonwealth Court's order decides a question which at least "two justices of [this] Court," id., deemed deserving of further review. No further proceedings involving this question are contemplated by the order of the Commonwealth Court, and we view the order "final."

5. Brief for Appellants 65. When asked, "What is it you sell?," G. Edward Wallis, Regional Vice-President of one of appellant-broadcasters, summarized, "We sell advertising." Record at 58a. In their complaint, appellants identify the "primary source of sustaining revenue as payments for advertising and commercial messages." Id. at 7a.

6. Act of June 1, 1889, P.L. 420, §§ 21 et seq., formerly 72 P.S. §§ 1871 et seq. (1949), repealed, Tax Reform Code of 1971, Act of March 4, 1971, P.L. 92, § 605, 72 P.S. § 7605 (Supp.1978). The Capital Stock Tax Act and the Tax Enabling Act are two of several taxing statutes which accord "manufacturing" special status, but do not define the term. See also, e. g., "Tax Anything Act," Act of June 25, 1947, P.L. 1145, as amended, Act of May 9, 1949, P.L. 898, formerly 53 P.S. § 6851, repealed, Tax Enabling Act, § 23, 53 P.S. § 6923; Local "Mercantile License Tax" Act, Act of June 20, 1947, P.L. 745, §§ 1 et seq., 24 P.S. §§ 582.1 et seq. (1962). This Court's decisions interpreting "manufacturing" for purposes of a particular taxing statute draw upon "manufacturing" cases under the several statutes. Indeed, in *General Foods Corp. v. Pittsburgh*, 383 Pa. 244, 118 A.2d 572 (1955), this Court analyzed "manufacturing" under the "Tax Anything Act"

*Products, Inc.,* 402 Pa. 361, 364, 167 A.2d 257, 258–59 (1961): " 'Manufacturing' as used in a legislative enactment is given its ordinary and general meaning.[7] It consists in the application of labor or skill to material whereby the original article is changed into a new, different and useful article: *Commonwealth v. Weiland Packing Company,* 292 Pa. 447, 449, 141 A. 148 (1928); *Pittsburgh v. Electric Welding Company,* 394 Pa. 60, 145 A.2d 528 (1958). Whether or not an article is a manufactured product depends upon whether or not it has gone through a substantial transformation in form, qualities and adaptability in use from the original material, so that a new article or creation has emerged: *General Foods Corp. v. Pittsburgh,* 383 Pa. 244, 118 A.2d 572 (1955). If there is merely a superficial change in the original materials, without any substantial and well signalized transformation in form, qualities and adaptability in use, it is not a new article or new production: *Commonwealth v. Weiland,* supra; *Pittsburgh Electric Welding Co.,* supra." ' "

*Commonwealth v. Deitch Co.,* 449 Pa. at 93–94, 295 A.2d at 837, quoting *Commonwealth v. Berlo Vending Co.,* 415 Pa. 101, 104, 202 A.2d 94, 96 (1964).

and the Local "Mercantile License Tax" Act together, citing cases under both statutes (*Armour & Co. v. Pittsburgh,* 363 Pa. 109, 69 A.2d 405 (1949) ("Tax Anything Act" and Local "Mercantile License Tax" Act); *Rieck-McJunkin Dairy Co. v. Pittsburgh Sch. Dist.,* 362 Pa. 13, 66 A.2d 295 (1949) (Local "Mercantile License Tax" Act)) and the now-repealed State Mercantile License Tax Act, Act of May 2, 1899, P.L. 184, formerly 72 P.S. §§ 2621 et seq. (*Commonwealth v. Weiland Packing Co.,* 292 Pa. 447, 141 A. 148 (1928)).

7. See 1 Pa.C.S.A. § 1903(a) (Supp.1978) ("[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage"); see also *First Data Corp. v. State Tax Comm'n,* Mass., 357 N.E.2d 933, 935 (1976) ("[a]s the [Massachusetts taxing] statute does not itself effectively define 'manufacturing,' . . . [Massachusetts] Legislature should be supposed to have adopted the common meaning of the word, as assisted by a consideration of the historical origins of the enactment").

■ *Deitch* demonstrates that "merely a superficial change in the original materials, without any substantial and well signalized transformation in form, qualities and adaptability in use," is not "manufacturing." In *Deitch*, this Court held that a scrap metal dealer is not entitled to the "manufacturing" exemption under the Capital Stock Tax Act. "[A]ppellant does begin and end with scrap or junk metal. It adds nothing to the mass as it arrives at the . . yard, but rather subtracts by cleaning away unwanted elements. . . . [T]he legal reality is that the transformation is merely superficial since the steel contained therein remains totally unchanged as a result of this activity." *Deitch*, 449 Pa. at 97, 295 A.2d at 839.

Several other cases of this Court illustrate that "manufacturing" involves more than "merely a superficial change." For example, in *Berlo Vending*, supra, a company mixed "popcorn" kernels, coconut oil, and salt and heated the mixture until the kernels "popped," "increasing the volume of each kernel from 30 to 36 times its original size." *Berlo Vending*, 415 Pa. at 103, 202 A.2d at 95. Merchantable "popped" corn was placed in bags and shipped in the company's trucks to the company's concession stands in movie theatres and other places of entertainment. This Court denied the company "manufacturing" status for purposes of the Capital Stock Tax Act: "[A]lthough there is a change in form, the kernel of corn is expanded to many times its original size and with the addition of some oil and salt, such change is merely superficial." Id., 415 Pa. at 105, 202 A.2d at 96. In *Commonwealth v. Sunbeam Water Co.*, 284 Pa. 180, 130 A. 405 (1925), a corporation which subjected ordinary water to heat, converted the water to steam, and condensed the steam to obtain distilled water did not "manufacture." This Court observed: "The distilled water produced by the [corporation] is subjected to certain additional refinements in cleansing it of impurities, but in its main essentials the process is the boiling of it to the point where it becomes steam and cooling it back to water." Id., 284 Pa. at 181–82, 130 A. at 406. And in *General Foods Corp. v.*

*Pittsburgh*, 383 Pa. 244, 118 A.2d 572 (1955), this Court concluded that "decaffeinated and instant coffee, tapioca, and certain canned products" were not manufactured. "None of those articles is a manufactured product, not having gone through a substantial transformation in form, qualities, and adaptability in use so that a new article or creation has emerged." Id., 383 Pa. at 251–52, 118 A.2d at 576.[8]

## II

Realistically viewed, appellants are not "manufacturers" in the common and approved usage of that term. Advertisers produce and record, either in transcript or on film, virtually all of the commercial messages appellants broadcast.[9] Appellants' announcers read transcribed materi-

8. Many other cases of this Court are in accord. In *Commonwealth v. Denston Felt & Hair Co.*, 304 Pa. 536, 156 A. 164 (1931), a corporation purchased hair from a tannery, washed and dried the hair, baled some of the cleaned product for upholstering and other commercial purposes, and made felt from the rest. This Court agreed with the Commonwealth that, "down to the point where the cleaned hair is ready for use by defendant company in the actual manufacture of felt, the processes detailed 'are nothing more than washing, drying, cleaning and assorting the hair.' A portion not used by defendant is sold, but when sold it is still hair. Its form has not changed. It had undergone nothing more than a cleansing process and has not been transformed into a new product. The sole difference between the washed article and the raw product is that the former is more free from dirt and other objectionable matter." *Denston*, 304 Pa. at 538, 156 A. at 165. *Commonwealth v. Weiland Packing Co.*, 292 Pa. 447, 141 A. 148 (1928), denied a "manufacturing" exemption to a corporation with cut, cured, and smoked "hams" from the carcasses of slaughtered animals. Accord, *Armour & Co. v. Pittsburgh*, 363 Pa. 109, 69 A.2d 405 (1949). Similarly, in *Commonwealth v. Lowry-Rodgers Co.*, 279 Pa. 361, 123 A. 855 (1924), this Court found no manufacturing where a company cleaned coffee beans, removed their outer skins, and roasted the beans, even though the beans changed color, weighed less, and increased in size.

9. Advertisers produce 97% of television commercials and 98.5% of radio commercials, while two per cent of television commercials and one-half of one per cent of radio commercials are produced by advertising agencies using broadcasters' facilities. Record at 257a. One per cent of both television and radio advertisements are produced by broadcasters. Id. Appellants do not argue that revenues derived from their production of one per cent of advertisements

als into electronic microphones and appellants' technicians project light through filmed materials and onto a surface from which an electrical signal can be extracted.[10]  Appellants then amplify and radiate the resulting electronic signals on appellants' exclusive, governmentally assigned wavelengths.  Like the popcorn company which converts popcorn kernels into popcorn and markets the converted product, the firm which distills water, and the company which markets its decaffeinated and instant coffees, appellants effect "merely a superficial change in the original materials."  See also *Assessors of Springfield v. Commissioners of Corporations and Taxations*, 321 Mass. 186, 72 N.E.2d 528 (1947) (conversion of human sound into electrical impulses for use in telephone system not manufacturing).  Any changes appellants effectuate are geared to appellants' own transmitting equipment, and do not produce "a new, different and useful article."  *Deitch*, supra.  As President Judge Bowman correctly summarized,

> "the essential function of broadcasting is the *transmission* rather than the *manufacture* of visual and sound information.  While broadcasting certainly makes that information more useful and useable, there are many processing functions that do likewise but do not result in the manufacture of a product."

*Golden Triangle Broadcasting, Inc. v. City of Pittsburgh*, 31 Pa.Cmwlth. 547, 563, 377 A.2d 839, 847 (1977) (footnote

should be segregated as revenues from manufacturing, see generally *Commonwealth v. Interstate Amiesite Corp.*, 412 Pa. 180, 184, 194 A.2d 191, 194 (1963) ("[t]he segregation of a taxpayer's activities for the purposes of taxation under the pertinent statute is proper and reasonable"), and we do not decide whether production of these advertisements constitutes manufacturing.

10.  The record identifies "tapes" as an additional medium from which electronic signals are extracted.  Record at 131a–132a.  Radio broadcasters, for example, receive tape-recorded commercial messages from advertisers and also record transcribed messages onto tapes for repeated use.  Id.

omitted). See *Commonwealth ex rel. Luckett v. WLEX–TV, Inc.*, 438 S.W.2d 520 (Ky.1968).[11]

It is true that appellants devote substantial energies to the procurement, scheduling, editing, and transmission of the many programs ultimately viewed and heard by their television and radio audiences. Indeed, a portion of these programs, including news broadcasts, are produced in appellants' stations. But to determine appellants' Business Privilege Tax liability on the basis of these activities would be to ignore economic realities. See e. g., *Commonwealth v. Arrott Mills Co.*, 145 Pa. 69, 74, 22 A. 243, 243 (1891) ("the corporation must be measured not by what it calls itself, but what it does"). Through program selection, production, and scheduling, appellants provide advertisers access to a consumer market with predictable characteristics. Just as in *Arrott*, supra, where this Court concluded that a corporation generating steam power for commercial tenants of the corporation's buildings is not a "manufacturer," but rather a "landlord supplying its tenants with steam-power in order to enable it the more readily to rent its buildings and rooms," 145 Pa. at 74, 22 A. at 243, appellants' program selection and production activities serve to enhance the value of the air time they offer advertisers.[12]

11. Section 602 of the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, 72 P.S. § 7602 (Supp.1978), now exempts from capital stock tax the stock of companies "organized for manufacturing, processing, research or development purposes." While the Act provides no definition of "manufacturing," it does define "processing." It should be noted that the Legislature includes in "processing" the activity of "broadcasting radio and television programs by licensed commercial or educational stations." Tax Reform Code of 1971, § 602(c)(11), 72 P.S. § 7602(c)(11).

12. In reviewing the Commonwealth Court's order, we are not presented with the question whether any of appellants' non-advertising, revenue-producing activities constitute "manufacturing." Appellants neither sought nor obtained partial relief from that portion of the City's tax imposed upon revenues derived from non-advertising activities. Rather, throughout these proceedings, appellants maintain that their entire operation is not subject to tax.

### III

We are mindful that the Tax Enabling Act withholds from the City the authority to tax "manufacturing," and doubts concerning the status of appellants' activity are to be construed in favor of appellants and against the City. See *Fischer v. Pittsburgh*, 383 Pa. 138, 142, 118 A.2d 157, 159 (1955) ("[a]ny doubt . . . concerning the construction of the ["Tax Anything Act" (predecessor of Tax Enabling Act)] must be resolved in favor of the taxpayer and against the city"). But in view of the common and approved usage of the term "manufacturing," see supra note 7, our many cases requiring more than a "superficial change in the original materials," and of course, the overriding presumption that "the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable," 1 Pa.C.S.A. § 1922(1) (Supp.1978), it must be concluded, upon a proper view of the record, that appellants are not engaged in "manufacturing." The Commonwealth Court correctly reversed the chancellor's decree.[13]

Order of the Commonwealth Court affirmed. Each party pay own costs.

MANDERINO, J., filed a dissenting opinion.

LARSEN, J., filed a dissenting opinion in which MANDERINO, J., joined.

Mr. Justice O'BRIEN and Former Justice POMEROY did not participate in the decision of this case.

MANDERINO, Justice, dissenting.

I join in the dissenting opinion of Mr. Justice Larsen. Prior to the hearing of this appeal I might not have thought

13. Appellants rely upon *City of Pittsburgh v. Pittsburgh Press Co.*, 14 Pa.Cmwlth. 551, 322 A.2d 390 (1974), in which the Commonwealth Court before decision in this case held that a newspaper's advertising revenues are not subject to the City's tax. *Pittsburgh Press* was not a holding of this Court and the issue presented there is not before us.

of "broadcasting" as "manufacturing" had the question been raised in general dinner conversation. In this appeal, however, we are called upon to consider the meaning of the word "manufacturing" by litigants who are entitled to have the same definition applied to them as has been applied to past litigants. Fairness requires that we apply a given definition uniformly to all those who claim the benefit of the manufacturing exemption. The Legislature has not provided a definition. If this were a case of first impression the word might be considered so vague or elusive in definition that it would be given no legal effect. As the opinions of Mr. Justice Roberts and Mr. Justice Larsen point out, however, this Court has given legal definition to the term "manufacturing." Having done so, that definition should be controlling. The facts in this case support the appellants' argument that they fall within the definition previously announced by this Court. Accordingly, the appellants are entitled to the relief which they seek.

LARSEN, Justice, dissenting.

I dissent. "Manufacturing", as noted by the majority, consists of the application of labor or skill to raw materials such that the materials undergo a "substantial transformation in form, qualities and adaptability in use . . . ." and are changed thereby into a new and different article. *Commonwealth v. Deitch,* 449 Pa. 88, 93, 295 A.2d 834, 837 (1972). However, the majority has misapprehended the nature of appellants' broadcasting activities and has, therefore, incorrectly concluded that appellants are not manufacturers.

The Chancellor made the following findings:

"The extensive record in this case provides ample support for the proposition that plaintiffs are engaged in manufacturing as that term has been construed by courts. In the broadcast of a TV program, optical information is changed into an electrical signal which is modified in many ways by the application of extremely complex tech-

nology. That electrical signal is eventually encoded and placed on the broadcaster's carrier and sent out to be received by a receiving set, decoded and put into such a state as to be viewed by the ultimate consumer. That which occurs in the television studio before the cameras may be viewed only by those who are in actual visual contact within the television studio, and *nothing is available for the benefit of the consuming public until the highly technical process of transforming optical information into an electrical signal and back has been completed by the application of skill and labor, which results in a new, different and useful product.* The same thing may be said of the radio broadcasting activities of plaintiffs. There, accoustical energy is changed to an electrical signal and made into a useful product.

What has been here said concerning the manufacturing character of the operations of plaintiffs is true *whether the material is produced originally in the broadcasting studio or comes to it by network feed. . . . In each case, however, a manufacturing process occurs.* Network feeds must be picked up when transmitted, monitored, taped and prepared for rebroadcast at the particular time that they are to be carried on the air. Each such network feed goes through the process of transformation which occurs when live programing occurs. *No matter which form* of news or entertainment or feature or sports *is being broadcast, the chancellor is convinced that a manufacturing process occurs.* One need only read the testimony of the witnesses to establish the highly technical nature of the transformation which must occur between the origination of the material and its consumption by the viewing or listening consumer even if his technical education is insufficient to establish a full understanding of the scientific nuances of the process." 74 D. & C.2d 156, 162, 165–66 (1976) (emphasis added).

My review of the record confirms that, no matter what the *source* of the broadcast (i. e., whether live studio broad-

casts, videotape, film or network feed), a substantial transformation of materials does occur. The record establishes that light or sound energy from the various sources are transformed by the use of labor, skill and complex machinery into electricity in the form of electrical signals, which are then amplified, shaped, modulated and further transformed through various processes into electromagnetic waves. These electromagnetic waves are then impressed upon, and combined with, a "carrier wave" so that they can be transmitted in a new and useful form, namely television or radio waves. A substantial metamorphosis occurs in both the form and quality of the materials used in the broadcasting operation—indeed, the transformation *must* occur before the materials can be of *any* use to the viewer or listener. Under the *Deitch* definition, therefore, appellants' broadcasting activities are "manufacturing" for purposes of the Local Tax Enabling Act.

Further, a proper application of the appropriate standard of appellate review compels the conclusion that appellants are manufacturers. Since the Local Tax Enabling Act imposes a limitation on the authority of the City to tax "manufacturing", *any doubts* concerning the status of appellants' activity *must be resolved in favor of appellants. Fischer v. Pittsburgh,* 383 Pa. 138, 142, 118 A.2d 157, 159 (1955). Apparently, the majority has no doubts. In my opinion, however, the evidence produced in the case is more than sufficient to raise doubt regarding appellants' status as a manufacturer.[1] *Fischer* requires us to resolve that doubt by finding appellants' activities to be manufacturing. Therefore, the City is without authority to tax appellants' revenues.

Finally, it is important to remember that the limitation placed by the legislature on the City's authority to tax is intended to encourage the growth of manufacturing in this

---

1. This opinion was also shared by the Chancellor and by Judges Rogers and Crumlish dissenting in the Commonwealth Court's decision.

Commonwealth. The courts, in their development of standards for determining whether or not a particular enterprise is engaged in manufacturing, should be concerned with achieving that legislative objective. To that end, the standards must be flexible and the courts must be willing to adapt the standards to comport with rapid technological and scientific progress. As research and development in countless areas produces techniques and processes that may have been hitherto unheard of, we must not rigidly bind ourselves to outmoded concepts. That we cannot physically grasp or feel the product of the broadcaster's manufacturing process does not mean manufacturing has not taken place. As the "Star Trek" era is ushered into our lives, this Court must be prepared to keep its perspectives progressive and its definitions flexible, or else this Commonwealth will fail to acquire modern, technological manufacturing operations.

MANDERINO, J., joins in this dissenting opinion.